RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Ella L. Daniels, Appellee.)

First District (Industrial Commission Division)    No. 1—93—1050WC

Opinion filed February 25, 1994.

Kane, Doy & Harrington, Ltd., of Chicago (Gregory E. Ahern and Victor P. Shane, of counsel), for appellant.

Grahn & Grahn, Ltd., of Chicago (Catherine L. Grahn, of counsel), for appellee.

JUSTICE SLATER delivered the opinion of the court:

The claimant, Ella L. Daniels, brought a workers' compensation claim against the employer, Rush-Presbyterian-St. Luke's Medical Center, alleging that on March 24, 1985, she suffered an injury in the course of and arising out of her employment. The arbitrator ruled in favor of the claimant. The Industrial Commission (Commission) affirmed the arbitrator, and the circuit court confirmed the Commission. The employer appeals.

In March of 1985 claimant was employed by Rush-Presbyterian-St. Luke's Medical Center as a dietary supervisor. At approximately 7:30 p.m. on March 24, 1985, she took the elevator from the seventh floor to the basement to get to the kitchen. When she got off the elevator, she was grabbed by two men. They held a knife to her neck and threatened to kill her. They then took her to a nearby stairway between the first and second floors. After taking a personal check from her with her name and address on it, they tied her hands, taped her mouth, and threatened to kill her and her family. The men repeatedly orally, vaginally and anally raped her during the course of the next two hours. Claimant was then left tied up in the stairway until she was ultimately found the following morning by a hospital visitor at approximately 8 a.m.

Claimant was taken to the emergency room and later transferred to the Sheridan Road Psychiatric Facility. At first, she was unable to talk and was afraid to be around people. After some time, she was able to speak and gave a description of the men who had attacked her. To her knowledge, the men have never been apprehended.

After leaving the psychiatric facility, claimant stayed at home in her room all day. She was nervous and did not allow her teenage daughters to go to school for a while. At night she had nightmares of the rape and by day she had flashbacks. She was afraid to leave her house by herself. She was eventually able to go out of her house with family members, but she remained fearful. Prior to the attack, claimant had never had any psychiatric treatment.

In April of 1985, claimant began seeing Dr. Milton Daugherty, who put her on medication for depression and anxiety. The medication helped, and she was still on antidepressant medication at the time of arbitration.

In 1986, claimant started feeling a little better and was able to go out and perform some activities on her own. She wanted to go back to work, but she did not want to return to work in the building in

which she had been raped because she remained frightened. In July of 1986, claimant's husband was disabled by a stroke. He was still disabled at the time of arbitration.

In August of 1986, claimant began working as a dietary supervisor at Gottlieb Hospital in Melrose Park. After working there for a while, she became more nervous. When she walked the halls and stairways she started having flashbacks. Sometimes, when she worked late, she would be afraid to leave the building. She took medication to help overcome her nerves, but sometimes she took too much and would become depressed.

During the summer of 1987, a close friend of claimant who had trained her and worked with her at Rush-Presbyterian-St. Luke's was murdered. The claimant thought that her friend had been killed by the same men who had attacked her. Thereafter, claimant again began having dreams about her assault. She was unable to sleep or concentrate and she continued to have hallucinations. In October of 1987, claimant stopped working at Gottlieb Hospital. Her job was kept open while she stayed home for two months and took various antidepressive medications. In December of 1987, the claimant was contacted by her supervisor. At that time, claimant officially quit her job at Gottlieb Hospital.

Claimant remained off work until she began feeling better in March of 1988. At that time, she began working part-time for Multitek in Melrose Park. In July of 1988 she started working there fulltime. At first, she worked in a small space away from a lot of people and did well. However, as she was asked to be around more people, particularly strangers, she began to get nervous. Then, in the fall of 1988, she heard about a lady that was raped on an elevated train platform. Once again, claimant began having dreams and flashbacks about her assault. Dr. Daugherty prescribed additional medication. She was unable to sleep or get out of bed. Her job was held open for two months, but she was unable to go back to it.

Since leaving Multitek in October of 1988, claimant has not looked for work. She felt she could not perform a job since she gets too nervous around people. Dr. Daugherty has never released her to return to work. She continues to receive medication for anxiety and depression, and she still undergoes psychiatric treatment. Additionally, she still has dreams and flashbacks about her assault. She is able to visit friends and relatives but is unable to deal with strangers.

Chicago police detective Patrick Foley testified that on March 25, 1985, he was assigned to investigate a rape at the Rush-Presbyterian-St. Luke's Medical Center. Claimant was the rape victim. The rape took place in the southwest stairwell of the Women's Cancer

Treatment Center, near the kitchen and the morgue. Foley stated that this was an area more frequented by employees than by visitors. Foley also indicated that the claimant was wearing a white hospital uniform at the time of the attack. Detective Foley observed the claimant in the emergency room and described her as glassy eyed. She was unable to respond to questions at that time.

On April 1, 1985, Detective Foley interviewed the claimant in the psychiatric department of the hospital. The claimant described the attack. In so doing, the claimant noted that the rapists had expressed disappointment that she was not a nurse. Based on this, Detective Foley concluded that the two men who attacked the claimant were looking for a nurse to abduct or rape.

Diane Sidebothem, Rush-Presbyterian-St. Luke's Medical Center's supervisor of investigations, testified that the hospital had closed-circuit TV monitors and walking patrols to monitor some areas of the hospital. Although the stairway where the claimant was attacked is now patrolled, there was probably no security officer assigned to that stairway at the time of the attack. Sidebothem also indicated that the day after the attack, the hospital received threats to three other members of the dietary department staff. Sidebothem further testified that in a post-attack interview, the claimant stated that her attackers said "Shit, she isn't even a nurse."

Dr. Zakko, a psychologist at Rush-Presbyterian-St. Luke's Medical Center, diagnosed the claimant as having posttraumatic stress syndrome and atypical dissociative disorder. Dr. Zakko referred the claimant to psychologist Milton Daugherty.

Dr. Daugherty diagnosed the claimant as having posttraumatic stress syndrome and a major depressive disorder. He concluded that the claimant's condition was chronic and that her inability to work was causally related to her rape. In Dr. Daugherty's opinion, the claimant's husband's stroke was not a cause of the claimant's inability to work.

Dr. Marvin Ziporyn, a psychiatrist, testified that he frequently examines and treats both rape victims and rapists. He stated that nurses are more prone to sexual assault than other females because they symbolize a strong maternal element. Dr. Ziporyn examined the claimant and diagnosed posttraumatic stress disorder. Dr. Ziporyn concluded that the claimant's condition resulted from her having been raped. He further testified that the murder of the claimant's friend was not causally related to the claimant's condition. Finally, Dr. Ziporyn opined that the claimant needed to remain under psychiatric care and that she could not sustain significant employment.

Dr. Arthur Price also examined the claimant. He concurred in

the diagnosis of posttraumatic stress disorder and the recommendation that she continue psychiatric therapy. However, he thought that the claimant could hold a job in a structured environment where she would not encounter too many strangers.

The arbitrator concluded that the claimant was permanently totally disabled and that the disability arose out of and in the course of her employment. The Commission affirmed the arbitrator, and the circuit court confirmed the Commission. The employer appeals.

■ The employer first argues that the attackers' statement "Shit, she isn't even a nurse" was inadmissible hearsay. Contrary to the employer's claim, no timely objection was made to admission of the statement which was part of the testimony given by Diane Sidebothem. This issue was raised for the first time before the circuit court. Although the circuit court considered it, we find it to have been waived for the purposes of this appeal.

The employer next contends that the Commission's finding that the sexual assault arose out claimant's employment was against the manifest weight of the evidence. Specifically, the employer contends that claimant's employment did not subject her to any greater risk than the general public.

To receive a workers' compensation award, it is not enough to show that an injury occurred in the course of employment. A claimant must also show that the injury arose out of that employment. "Arising out of" refers to the causal connection between the employment and the injury; that is, the injury must have had its origins in some risk incidental to the employment. (*County of Cook v. Industrial Comm'n* (1988), 165 Ill. App. 3d 1005, 520 N.E.2d 896.) If the injury results from a hazard to which the employee would have been equally exposed apart from the employment, then it does not arise out of it. (*Greene v. Industrial Comm'n* (1981), 87 Ill. 2d 1, 428 N.E.2d 476.) The question of whether or not an injury arose out of the employment is usually one of fact for the Commission to decide. (*W.K.I.D. Broadcasting Co. v. Industrial Comm'n* (1969), 42 Ill. 2d 236, 246 N.E.2d 277.) The court may not reject reasonable inferences drawn by the Commission based upon competent evidence merely because other inferences might be drawn by the reviewing court. *Eagle Discount Supermarket v. Industrial Comm'n* (1980), 82 Ill. 2d 331, 412 N.E.2d 492.

In *Brady v. Louis Ruffolo & Sons Construction Co.* (1991), 143 Ill. 2d 542, 578 N.E.2d 921, the claimant was injured when a truck left an adjacent highway and crashed through the building where claimant was working at a drafting table. In affirming the Commission's finding that claimant's injuries did not arise out of his

employment, the court noted that merely because a claimant was present at the place of injury due to his employment duties is not alone sufficient to establish that the injury arose out of the employment. "Rather, a claimant must demonstrate that his risk of the injury sustained is peculiar to his employment, or that it is increased as a consequence of the work." (*Brady*, 143 Ill. 2d at 550, 578 N.E.2d at 924.) The *Brady* court distinguished *Holthaus v. Industrial Comm'n* (1984), 127 Ill. App. 3d 732, 469 N.E.2d 237, in which the appellate court reversed the Commission's decision denying compensation to a swimming pool manager who was shot by an escaped convict while she was working alone at the pool. The *Holthaus* court found that the isolated area where claimant was required to work created an enhanced risk of criminal assault. The court concluded that a claimant was entitled to compensation where she proved either that the working environment increased the risk of attack or that the attack was motivated by something related to claimant's employment.

■ We find that this case is more akin to *Holthaus* than *Brady*. Here, the totality of the evidence establishes that the claimant, due to her employment, was exposed to a greater risk of sexual assault than the general public. Specifically, Dr. Ziporyn explained that nurses are more prone to sexual assault than other females because they symbolize a strong maternal element. According to Dr. Ziporyn, one of the major problems in the psychopathology of males is the inability to work through the Oedipal complex. There is an unconscious desire to achieve sexual union with the mother figure. In the minds of a lot of disturbed men, the nurse represents an available mother figure.

At the time of the attack, the claimant was wearing a white hospital uniform and was in an area of the hospital more frequented by hospital staff than by visitors. During the attack, the attackers expressed disappointment that their victim was not a nurse. Under these circumstances, the Commission's finding that the sexual assault arose out of the claimant's employment was not against the manifest weight of the evidence.

The employer next argues that the Commission's finding that the claimant's condition of ill-being was causally related to the sexual assault was against the manifest weight of the evidence. The employer contends that the claimant's husband's stroke and the murder of her friend aggravated her condition and were the true causes of her inability to work. We disagree.

■ Dr. Daugherty diagnosed the claimant as having posttraumatic stress syndrome and a major depressive disorder. He concluded

that the claimant's condition was chronic and causally related to her rape. Moreover, Dr. Daugherty testified that although the claimant's husband's stroke did not help the claimant's condition, it was *not* a cause of the claimant's inability to work. Additionally, Dr. Ziporyn concurred with Dr. Daugherty's opinion that the claimant's condition resulted from her having been raped. Dr. Ziporyn also testified that the murder of the claimant's friend was *not* causally related to the claimant's condition. Based upon this testimony and the other evidence in the record, we are unable to say that the Commission's conclusion that the claimant's condition of ill-being was causally related to the sexual assault was against the manifest weight of the evidence.

The employer's final argument is that the Commission's finding that the claimant was totally and permanently disabled was against the manifest weight of the evidence. The employer notes that the claimant was able to leave her home to pursue other activities and that she did hold a job at Gottlieb Hospital for over a year.

A claimant is not required to prove total incapacity or helplessness before a permanent total disability award may be granted. (*Interlake, Inc. v. Industrial Comm'n* (1981), 86 Ill. 2d 168, 427 N.E.2d 103.) Moreover, evidence that an employee has been or is able to earn occasional wages neither precludes a finding of total disability nor requires a finding of partial disability. *E.R. Moore Co. v. Industrial Comm'n* (1978), 71 Ill. 2d 353, 376 N.E.2d 206.

■ In the instant case, both Dr. Daugherty and Dr. Ziporyn indicated that the claimant would be unable to hold a long-term job in the future. We recognize that Dr. Price opined that the claimant could hold a job in a structured environment where she would not encounter too many strangers. However, it is properly the function of the Commission to judge the credibility of the witnesses, draw reasonable inferences from testimony, and determine the weight to be given testimony. (*Smith v. Industrial Comm'n* (1983), 98 Ill. 2d 20, 455 N.E.2d 86.) Additionally, Commission decisions are given great deference as to their findings of fact, including their findings of fact pertaining to medical evidence presented. (*Sears, Roebuck & Co. v. Industrial Comm'n* (1980), 79 Ill. 2d 59, 402 N.E.2d 231.) Thus, under the circumstances of the instant case we are unable to say that the Commission's finding of total permanent disability was against the manifest weight of the evidence.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

McCULLOUGH, P.J., and RAKOWSKI, WOODWARD and RARICK, JJ., concur.